```
1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
2                             EASTERN DIVISION

3    STROM HOLDINGS, LLC.,                    ) No. 18 CV 611
                                              )
4              Plaintiff,                     )
     vs.                                      ) Chicago, Illinois
5                                             )
     TYKABLES LLC.,                           ) February 15, 2018
6                                             )
               Defendant.                     ) 2:04 o'clock p.m.
7

8                        TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE   JOAN H. LEFKOW
9

10
     For the Plaintiff:      REVISION LEGAL, PLLC
11                           BY:  Anderson Josiah Duff
                             244 5th Avenue
12                           Suite 2230
                             New York, New York 11101
13                           (212) 996-4103
                             Email: anderson@revisionlegal.com
14

15    For the Defendant:     DAVIS MCGRATH, LLC
                             BY:  William T. McGrath
16                           125 South Wacker Drive
                             Suite 1380
17                           Chicago, Illinois 60606
                             (312) 332-3033
18                           Email: wmcgrath@davismcgrath.com

19

20   Court reporter:         FEDERAL OFFICIAL COURT REPORTER
                             Blanca I. Lara
21                           219 South Dearborn Street
                             Room 2504
22                           Chicago, Illinois 60604
                             (312) 435-5895
23                           blanca_lara@ilnd.uscourts.gov

24

25
```

| | |
|---|---|
| 1 | (Proceedings taken in open court:) |
| 2 | THE CLERK:  18 C 611, Strom Holding v. Tykables. |
| 3 | (Brief pause). |
| 4 | THE CLERK:  Step forward, please. |
| 5 | (Brief pause) |
| 6 | MR. MCGRATH:  Good morning, Your Honor. |
| 7 | THE COURT:  Good afternoon. |
| 8 | MR. MCGRATH:  William McGrath on behalf of the |
| 9 | defendant. |
| 10 | MR. DUFF:  Good morning, Your Honor.  Anderson Duff on |
| 11 | behalf of plaintiff, Strom Holdings. |
| 12 | THE COURT:  Good afternoon.  Time flies.  It's |
| 13 | afternoon. |
| 14 | All right.  So what do we have here?  I mean, I've |
| 15 | read the materials, but what's the response to the motion? |
| 16 | MR. MCGRATH:  Your Honor, first of all, I would like |
| 17 | to mention that I was just retained yesterday, late yesterday. |
| 18 | This is not a client that I've worked with before.  So I really |
| 19 | haven't been able to completely digest the papers.  And I was |
| 20 | not a participant in any of the settlement negotiations that |
| 21 | were proceeding, you know, over a period of several days a few |
| 22 | weeks ago. |
| 23 | And so what we would like is to push the case over for |
| 24 | a couple of weeks so that I can get up to speed on this.  The |
| 25 | parties -- the parties came, you know, this close to having a |

02:04:39

02:04:44

02:04:59

02:05:25

02:05:46

1    settlement.

2         THE COURT:  Good.

3         MR. MCGRATH:  And in my opinion, I think it makes

4    sense to try to get over that hurdle.  I don't know what it was

02:06:00    5    that broke things down.  I do know that they filed this while

6    my client was down in Louisiana at his father's funeral, which

7    we did not appreciate.

8         So my point is, there's really no urgency to this

9    matter.  Nothing is any different than it was when the

02:06:22   10    settlement discussions were going on.  There's just no urgency

11    to the matter, in a few weeks, to let the parties catch their

12    breath, try to regain where they were one week ago today when

13    the settlements broke down.  That would be our suggestion for

14    proceeding.

02:06:41   15         THE COURT:  Okay.  Mr. Duff?

16         MR. DUFF:  Your Honor, I would like to thank you for

17    being here today, and I would like to thank opposing counsel

18    for being here.  I do realize that it was short notice.

19         For the plaintiffs, there's definitely an urgency

02:06:59   20    here.  There was urgency when we initiated settlement

21    discussions and hoped that we could avert this action.  And, in

22    fact, my client is still amenable to settlement.  We made a

23    proposal immediately before this hearing.

24         The urgency is that my client has become aware that

02:07:21   25    distribution has occurred, at least somewhere, of the

1    infringing product.  And the marketing online is creating a
2    kerfuffle in our client's directly overlapping consumer groups.

3        My client did not want to bring this action.  My
4    client was furiously trying to settle this action.  For
5    previous days we had near constant contact with the previous
6    counsel and thought we had a settlement.

7        But, in our view, at the last hour, opposing counsel
8    came back with terms that were -- in our view, Strom had
9    already been incredibly generous with its offer.  The
10   defendants in this case were insisting on terms that our client
11   cannot abide by.  So every day that they continue marketing,
12   Space Cadet diapers continues to undermine our client's brand.

13       THE COURT:  Okay.  Well, how do you feel about setting
14   this over at least for a brief amount of time, let
15   Mr. McGrath work with his new client?

16       MR. DUFF:  Your Honor, if the defendant was willing to
17   cease all online marketing, or marketing otherwise that uses
18   the word "Space," then agree not to distribute in the United
19   States, I believe my client would be more than fine with
20   putting this off for a little bit.

21       THE COURT:  All right.  So go ahead.

22       MR. MCGRATH:  That was basically one of the terms in
23   the agreement that had been agreed to.  And we're willing to go
24   along with term number 2 in the e-mail chain, which if Your
25   Honor would like a copy, I have one.  But there were other

1  points that had been agreed upon, too, such as that Strom would

2  cease immediately from further public comments and social

3  media, or any other public forum about the case, that's

4  important to us.

02:09:31  5  The key points here were agreed upon. This comes down

6  to what will the joint statement say, which two reasonable

7  parties really ought to get together and get that. And Strom

8  agreed to change the font of its brands, and that's the other

9  disagreement.

02:09:54  10  You know, the change that they said they would make,

11  or when they showed us what it was they wanted to change to, we

12  found imperceptibly different and we thought there should be

13  something more, that's what it comes down to. So we can agree.

14  This point 2 says:

02:10:16  15  "The parties --" oh, no. I'm sorry.

16  "... Tykables agrees immediately to re-brand

17  Space Cadet-themed diapers online and in any

18  other marketing and never use the word "Space"

19  in connection therewith. In addition, Tykables

02:10:33  20  would immediately re-brand online and other

21  physical products sold under Space Cadet,

22  including holding backpacks and bedding. The

23  physical inventory that has already been ordered

24  of roughly 9,000 individual bags may be sold as

02:10:50  25  is for 6 months from signing of the settlement

1        agreement by which all inventoried not sold must

2        be re-stickered or otherwise modified in such a

3        way that "Space" does not appear on the goods or

4        packaging."

02:11:06   5        That we've agreed to already, and we could agree to

6   going forward until we can have a hearing on whatever else is

7   needed.

8        THE COURT:  That sounds appropriate to me.  I mean, it

9   looks like -- I mean, this looks like a pretty clear-cut case

02:11:24   10  that there's a likelihood of confusion here and elements of a

11  preliminary injunction, at least.  But rather than, you know,

12  be preferable, if you could agree to a stopgap order rather

13  than my having to decide it for you.

14       MR. DUFF:  Your Honor, we completely agree with that

02:11:46   15  sentiment, and we regret being here today.  We did everything

16  that we could to avoid being here.

17       The two points of disagreement I just would like to

18  mention are not insignificant.  First, our client's concession

19  to stop discussing this case was a huge concession.  That's a

02:12:06   20  prior restraint that the defendant is asking for.  And our

21  client has done nothing but attempt to educate the consumers,

22  because, as I said, this has caused a significant

23  disruption--and by 'this" I mean defendant's willful trademark

24  infringement--has caused significant disruption to my client's

02:12:28   25  business.  But my client, in good faith, was willing to cease

1    discussions of that.

2         The second point involves the font of entirely

3    unrelated trademarks.  And it's not a stylization that is

4    distinctive.  It is -- and, in fact, our client for the two

02:12:48    5    unrelated marks, the font that my client uses is not the same

6    font as the font that the defendant uses.  Nevertheless --

7         THE COURT:  Well, why is that even being discussed?

8         MR. DUFF:  Because the defendant insisted upon it.

9         THE COURT:  Is it part of this case that I

02:13:05    10   overlooked --

11        MR. DUFF:  No, it has nothing to do with the

12   underlying merits of this case.  It was a serious concession

13   that my client was willing to make to avoid this hearing.

14        MR. MCGRATH:  It is, Your Honor, part of the agreement

02:13:21    15   in principle, though.

16        MR. DUFF:  Which was made before we were forced to

17   bring this action.

18        THE COURT:  Okay.  So, I don't know if, Mr. McGrath,

19   you're able to respond to that, but why is this being

02:13:34    20   discussed?

21        MR. MCGRATH:  Because this is something our client,

22   back in 2016, had contacted them about and said, the font

23   you're using is too similar to the font we use in this

24   industry, and our font is recognizable as ours.  And they had

02:13:51    25   changed their font to make it look like ours.  So there's an

1    element, you know, of trademark infringement there, or trade

2    dress infringement.  So we instituted that process, you know,

3    two years ago, and we made it part of the agreement.

4         And just to be clear, in Mr. Duff's February 7 e-mail,

02:14:17    5    it starts out to prior counsel here saying:

6         "Kevin, I am pleased to report that we have an

7         agreement.  The terms are as follows... ."

8         And that font -- that they will change their font is

9    one of the points.

02:14:33    10         MR. DUFF:  But that agreement --

11         MR. MCGRATH:  And so is their agreement to stop the

12    same things on social media.  So this is more of an enforcement

13    of an agreement in principle than a prior restraint.

14         MR. DUFF:  That agreement was not accepted by the

02:14:47    15    defendant.  The former counsel came back and rejected the new

16    font that we had -- that my client had selected as a showing of

17    good faith.

18         THE COURT:  Okay.  Well, I don't think we have to deal

19    with the font issue to resolve what we're going to do today.

02:15:07    20    That is, to me it seems that the agreement to stop marketing,

21    or whatever your essential point was there, I didn't write it

22    down --

23         MR. DUFF:  Right.

24         THE COURT:  Pending the disposition of the lawsuit.

02:15:27    25    And I would say limiting what the plaintiff can say about the

1    defendant to, you know, just responding to what?  Confusion?

2    Customers who ask questions, they should be able to respond to

3    that, right?

4         MR. MCGRATH:  If it were -- if that would be true, but

5    it's comments about the lawsuit that have been going on, that's

6    not something we appreciate.

7         MR. DUFF:  That's a public matter.  I mean, they're

8    asking for a prior restraint.

9         THE COURT:  Well --

10        MR. MCGRATH:  They agreed to it.

11        THE COURT:  Well, what does the plaintiff want to say?

12   Why is it necessary until we can get this thing to a hearing,

13   at least, what do you have to say?

14        MR. DUFF:  For my client, my client is doing damage

15   control talking about this case, because other people, and the

16   clients, both parties directly overlapping in consumers, are

17   talking about the case.  And they're going to continue talking

18   about the case.  And if my client can't have a voice in that

19   conversation, that's going to be a problem.  The defendant is

20   welcome to join that conversation.

21        THE COURT:  Well, do you want me to -- shall I just

22   rule here, or do you want to try to work it out, or do you want

23   to have a long, drawn-out motion for a preliminary injunction?

24        MR. MCGRATH:  Your Honor, since we're only -- we're

25   only proposing to go out maybe two weeks to set a new date.  I

1  don't see they can't agree to a point they've already agreed to

2  it.  If it was so crucial to them, you know, it's --

3          THE COURT:  The point being that --

4          MR. MCGRATH:  It's Mr. Duff's letter that says:

02:17:21   5          "I am pleased to report we have an agreement

6          ..."

7          They, in a sense, agreed to it.  Where this broke down

8  was the joint statements to be crafted by the parties, which,

9  if you go through them, they're substantively basically the

02:17:38   10  same, it's just the difference of expression.

11          THE COURT:  So you had crafted a statement that both

12  sides could make to any relevant interest?

13          MR. MCGRATH:  They crafted one and we responded with

14  ours, "how about this instead," then that's where things broke

02:17:58   15  down.

16          THE COURT:  Well, I mean, show me your statements and

17  I'll decide.

18          MR. MCGRATH:  The two statements?

19          MR. DUFF:  But, Your Honor, I just like to say, this

02:18:13   20  was -- we were working toward a settlement that was rejected by

21  the defendant.  Now the situation has significantly changed,

22  and my client's view is that he should not have to make a joint

23  statement like that.  My client would consider that, but, at

24  this point, that's off the table as far as my client is

02:18:35   25  concerned.

1    And as is the font issue, which is a non-issue.  It

2 involves unrelated trademarks.  There's no infringement there.

3 My client was willing to make pretty serious concessions at

4 that point to avoid this hearing, but the defendant came back

02:18:58 5 and rejected our proposal.  So there was no settlement

6 agreement.

7    MR. MCGRATH:  Your Honor, to say we rejected the

8 proposal is I would call it inaccurate.  They created a

9 proposal and sent it to us.  We created a substantively similar

02:19:21 10 proposal and sent it to them, here's what we would suggest.

11 The next statement we got from them was:

12    "... Strom has already made serious concessions.

13    It does not agree to the use of the statement

14    below or move for a further font ..."

02:19:33 15   So they just kind of said "no" to us.

16    THE COURT:  Well, "the statement below" is not quite

17 apropos right now --

18    MR. MCGRATH:  I'm sorry.  I'll show you where the

19 various joint statements are.

02:19:47 20    MR. DUFF:  I mean, to be clear, there was the other

21 more significant question of whether our client was going to

22 re-brand with a new font.  My client was willing to do that,

23 and proposed a font, and that was rejected by the defendant.

24    Now, that was not insignificant.  My client,

02:20:09 25 internally, had to spend a lot of time with its designer coming

1    up with new mock-ups and was prepared to do that.  And they

2    didn't need to.  My client doesn't need to do that.  Didn't

3    need to agree to a joint statement.

4        So when my client's proposed a joint statement and my

02:20:26    5    client's proposed new font, which, again, Strom has never used

6    the font that the defendant uses, but my client selected a

7    third font that is further away, and that was rejected by

8    defendant.

9        THE COURT:  Is this Cushies that I'm looking at?

02:20:46    10    MR. MCGRATH:  Yes, Your Honor, on page 3 there.  And

11    keep in mind, we're not talking about the logo or the

12    extraneous things, it's just the font.  And the old font is

13    shown at the bottom, and then what they proposed as the font,

14    the letters, is immediately above.  And they responded, "what

02:21:05    15    do you mean?  It looks like the same font."

16        So we were perplexed that they considered this font,

17    the new font different from the old font.  We're not saying --

18    we don't care what font they use so long as it doesn't look

19    like our font.  They have a whole universe of fonts they could

02:21:26    20    use that would be different and distinguishable from ours, but

21    what they proposed to change to looked like no change at all to

22    us.

23        MR. DUFF:  Your Honor --

24        THE COURT:  I guess my intention here is, I will --

02:21:40    25    unless you can come up with a better answer, I'll just grant

1    this motion for a preliminary injunction, because, you know, I

2    think all of the elements are met, and I don't see any disputes

3    of fact from what I'm hearing today.

4              Now, I know, Mr. McGrath, you say you need more time,

02:22:05    5    but, I mean, I can grant the motion and then we'll come in and

6    revisit the issue after you've had a chance to talk.

7              MR. MCGRATH:  I don't see how there's any irreparable

8    injury.  They've already agreed that the parties can have

9    6 months to re-brand, and so forth, and sell off their

02:22:26    10   inventories.  So where is the irreparable injury?  You know, in

11   trademark cases it used to be that there was a presumption of

12   irreparable injury, but that's not the case anymore.

13             THE COURT:  The law has changed.

14             MR. MCGRATH:  The law has changed on that.

02:22:47    15            THE COURT:  So what is the proof that has to be shown?

16             MR. MCGRATH:  There has to be a showing of irreparable

17   harm, not a presumption of irreparable harm.  So there's no

18   sales being lost.  We haven't even begun selling.

19             MR. DUFF:  Your Honor, the harm will be to my client.

02:23:03    20   The relevant sales would be my client's lost sales.  And more

21   than that, the integrity of my client's brand, that's the

22   irreparable harm.

23             THE COURT:  Let me say what you're saying about

24   irreparable harm.

02:23:20    25            You say the consumer confusion is irreparably harming,

1    and you have some evidence of that, correct?

2            MR. DUFF:  Well, there is an ongoing discussion, which

3    is amongst savvy consumers of both parties discussing this

4    case, which is why my client wants to have a voice in that

02:23:37    5    conversation.

6            And the fact that we're even here today shows this has

7    caused a significant interruption to my client's business.

8    There is irreparable harm here.  And my understanding is that

9    there is still a presumption recognized in the Northern

02:23:55    10   District of Illinois of irreparable harm.

11           THE COURT:  You're saying in your brief, on page 11:

12           "... The Northern District of Illinois

13           recognizes that, due to the nature of trademarks

14           as repositories of goodwill and public trust,

15           irreparable harm is presumed in trademark

16           infringement cases just as it is presumed that a

17           party in Strom's position has no adequate remedy

18           at law ..."

19           Now, that's Northern District of Illinois 2012.  Do

02:24:32    20   you have --

21           MR. MCGRATH:  I believe that was prior to the

22   MercExchange case, eBay versus MercExchange by the Supreme

23   Court.

24           THE COURT:  So it's eBay versus --

02:24:43    25           MR. MCGRATH:  MercExchange.

1    THE COURT:  You don't happened to know the cite?

2    MR. MCGRATH:  I don't.

3    THE COURT:  Well, I'm sure we can look it up.

4    (Brief pause)

02:24:59    5    MR. DUFF:  To my knowledge, that's not been addressed

6    by the Northern District.  However, even absent a presumption

7    of irreparable harm, there's enough here to show irreparable

8    harm to my client's brand.

9    The guiding principles behind the presumption of

02:25:19    10    irreparable harm still guide us to only one conclusion, that my

11    client's brand is being irreparably harmed.  The fact that

12    there are discussions here about my client and this lawsuit and

13    the trademark itself are irreparably harming my client.  And

14    this is a case of willful infringement, this is not a case of

02:25:40    15    an innocent party who didn't know what they were doing.

16    MR. MCGRATH:  I strongly disagree with that, Your

17    Honor.

18    THE COURT:  What I'll do is enter this order as a

19    temporary restraining order.  So that gives the defendant

02:25:53    20    14 days to -- I don't know if I'm going to be sitting in

21    14 days.

22    THE CLERK:  You might not be.

23    THE COURT:  I'll be gone.

24    (Brief pause).

02:26:05    25    MR. MCGRATH:  Well, within a reasonable period before

1  or after that.

2  THE COURT:  What we could do --

3  THE CLERK:  Next week or the week of March 12th,

4  March 13th.

02:26:23    5  MR. MCGRATH:  Well, let's do it the week before that,

6  then.  Which day is that?

7  THE CLERK:  Wednesday, it's the 21st of February.

8  MR. DUFF:  I'm afraid I'm going to be in Mexico City.

9  My understanding is -- I'm sure I could have one of my partners

02:26:42   10  be here, but since the defendant is not -- to our

11  understanding, is not planning to actually start selling until

12  April, the only thing they have to do is remove the branding

13  from -- remove "Space," one word, from their marketing online

14  and elsewhere.  And so there's virtually no harm to the

02:27:04   15  defendant by extending this for slightly longer, and we would

16  request that.

17  THE COURT:  Well, I guess that would be agreeable to

18  both sides, then.  So would you be satisfied then with an order

19  that says that the defendant has to remove the word "Space"

02:27:24   20  from its branding and advertising pending disposition of this

21  case on the merits?

22  MR. DUFF:  Yes.  As long as they also could not sell

23  or distribute using Space, yeah.

24  THE COURT:  Right.

02:27:43   25  MR. MCGRATH:  And would the restriction from them

1    discussing the case online be part of the order?

2         THE COURT:  No, I don't really see that as --

3         MR. MCGRATH:  Well, they're out there -- what they're

4    saying out there makes our client look bad.

02:28:07

5         THE COURT:  How about non-disparagement?  Some agreed

6    neutral statement, this is in litigation, or something like

7    that.

8         MR. DUFF:  Well, I don't think anything my client is

9    saying is disparaging, discussing -- defendants might think

02:28:22

10   that discussing the facts of this case makes them look bad, but

11   that's because this is a case of willful infringement.  They

12   are in the wrong here, and the defendant cannot be upset that

13   they look bad for their own bad acts.

14        THE COURT:  What kind of things are being -- I mean,

02:28:38

15   what's going on?  Give me a sense of context here.

16        MR. DUFF:  I'm not sure exactly what the defendant is

17   upset about, so ....

18        MR. MCGRATH:  First of all, they keep calling this

19   willful infringement, but our client has been using the term

02:28:51

20   "Space Cadet" since late 2015.  Not on diapers, for other

21   things.  So this was -- and there had been no complaints about

22   that.

23        To expand their line to a product that has been being

24   sold within their store, expand Space Cadet to that, is hardly

02:29:12

25   willful infringement.  Nor do I agree that there's a certainty

1    of likelihood of confusion.  These are two different words.

2    Also, this is a very niche market.  As Your Honor may have

3    perceived from some of the materials, these are adult diapers

4    being sold to people with a certain interest.  They're called,

5    if I can remember the term, adult baby diaper lovers.  They're

6    for individuals who, you know, enjoy baby things, and wearing

7    baby clothes, and so forth like that.

8         It's very -- and this is the community that these --

9    that both parties are dealing with.  And this is the community

10   that they're trying to say things to.  And this community knows

11   very well the difference between their client and our client.

12        There aren't that many companies in this space.  And I

13   guess we could call them sophisticated purchasers.  So they're

14   not confused.  I don't think we can assume that there is a

15   great likelihood of confusion here.

16        THE COURT:  There is some likelihood of confusion, I

17   would say.  I, as your disinterested observer, would say that I

18   would associate them with the same company.

19        MR. DUFF:  And, Your Honor, back to your question

20   about non-disparagement.  I think the definition in libel laws

21   are already in place.  And if my client runs afoul of those, I

22   will be happy to take them to task.  But, not to my knowledge,

23   that's not happened, and my client should have a right to speak

24   publicly about a public case.

25        THE COURT:  Okay.  Well, I won't impose -- I won't

02:31:48

1   impose any gag order here.  I will otherwise let you prepare a

2   draft order that simply limits the marketing and sale of these

3   products until further order of Court.  And then let's get a

4   date where we can set this down for a hearing if there's any

5   need, or give the defendant time to respond on some of these

6   issues.  And the order can always be modified if, you know,

7   there's good cause for that.  The cause, that is, you know,

8   seems right under the law and the facts.

9          MR. DUFF:  Thank you, Your Honor.

02:32:10

10          THE COURT:  Okay.  So, Mr. Duff, you prepare an order

11   and run it by Mr. McGrath.  And then what is the date?  You

12   want to pick a week that we can try to proceed further?

13          MR. DUFF:  Sure.  And I'm sorry that February 21st

14   doesn't work.  I'd be happy to agree to a date that's as close

02:32:43

15   to that as possible.

16          THE COURT:  Well, the week of March 12th would be

17   available.  The 13th or the 14th.

18          THE CLERK:  The 13th or the 14th, basically.

19          MR. MCGRATH:  Well, let's say the 13th, then.

02:32:59

20          THE CLERK:  The 13th?

21          MR. MCGRATH:  13th.

22          THE CLERK:  In the afternoon, Judge?  Just in case

23   it's longer?

24          THE COURT:  I suppose so.  Let's set it in the

02:33:08

25   afternoon if you think there's a need -- I mean, I don't want

1   you to bring in witnesses unless there's clearly a dispute of

2   facts.  So let's set a time for the defense to respond to the

3   motion.

4            (Brief pause).

02:33:27   5            THE COURT:  How about the 28th?

6            MR. MCGRATH:  The 28th?

7            THE COURT:  Or the 1st of March is two weeks.

8            MR. MCGRATH:  The 1st of March would be okay.

9            THE COURT:  And then I guess the 8th for any reply.

02:33:47   10           THE CLERK:  So that would be March 13th at 2:00

11  o'clock.

12           THE COURT:  So you should address in your papers

13  whether or not there's a need or there are issues of fact that

14  would have to be decided on a preliminary basis, but I do urge

02:34:07   15  you to keep talking and try to just resolve this.

16           MR. DUFF:  We had discussed that even before the

17  hearing, the possibility of settlement now that new counsel is

18  involved.  My client very much regrets being here and would

19  like to resolve this without further intervention from the

02:34:29   20  Court.

21           THE COURT:  Okay.  That sounds good.

22           MR. MCGRATH:  Thank you, Your Honor.

23

24

02:34:37   25

1        MR. DUFF:  Thank you.

2

3        (Which concluded the proceedings had on this

4         date in the above entitled cause.)

5

6              *     *     *     *     *     *     *     *

7

8

9   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

10       RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER

11

12

13   /s/Blanca I. Lara                    February 16, 2018

14

15

16

17

18

19

20

21

22

23

24

25